857 A.2d 101

Jeffrey E. ALLEN

v.

STATE of Maryland.

No. 02268, Sept. Term, 2002.

Court of Special Appeals of Maryland.

Sept. 2, 2004.

196

Stacy W. McCormack (Stephen E. Harris, Public Defender, on brief), for appellant.

Devy Patterson Russell (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel HOLLANDER, ADKINS, and BARBERA, JJ.

HOLLANDER, J.

A jury sitting in the Circuit Court for Charles County convicted appellant, Jeffrey E. Allen, of the first degree felony murder of John Butler. Allen was also found guilty of second degree murder (specific intent to kill); robbery with a deadly weapon; robbery; theft; and two counts of carrying a weapon openly with intent to injure.[1] The court sentenced Allen to life imprisonment, without the possibility of parole, for the felony murder conviction, and concurrent sentences of thirty years for second degree murder, twenty years for robbery with a dangerous and deadly weapon, and three years for each count of openly carrying a weapon with intent to injure. The remaining convictions were merged.

On appeal, appellant poses four questions, which we have reordered and rephrased slightly:

I. Did the trial court err in denying appellant's motion to suppress?

II. Did the trial court err in its instructions to the jury with regard to aggravated robbery as a predicate for felony murder?

III. Was the evidence legally sufficient to sustain appellant's convictions for robbery with a dangerous and deadly weapon and first degree felony murder?

---

1. Appellant was acquitted of first degree premeditated murder.

IV. Did the trial court err in imposing separate sentences (1) for both first degree felony murder and second degree specific-intent-to-kill murder of the same victim, and (2) for both felony murder and the underlying felony?

For the reasons that follow, we shall vacate the judgment of conviction for felony murder and remand for a new trial. We shall affirm the remaining convictions. In light of our ruling, we need not reach the claim of error as to sentencing.

## I. *Factual Summary*

### A. Suppression Hearing

Appellant moved to suppress several oral and written statements he made on October 24, 2001. In particular, he challenged statements to Officers Cecilia Johnston and Jonathan Burroughs at a store parking lot; to Officer Burroughs while in a police car; and to Sergeant Michael Almassy during two separate interviews at the sheriff's office. What follows is a summary of the evidence adduced at the suppression hearing held in March and April of 2002.

Sergeant Jeffrey Bryant of the Charles County Sheriff's Department was monitoring the radio at 9:42 a.m. on October 24, 2001, when a request was made for a patrol unit to respond to the Ironsides Store. According to Bryant, the caller "was reporting" that "[a]n individual had tried to assault the caller the night before. That he [i.e., the caller] had stabbed that individual, and stabbed that individual until he stopped moving." The caller also stated that he had run a car into a ditch. Sergeant Bryant dispatched several officers.

Sergeant Cecilia Johnston proceeded to the Ironsides Store in response to the call. On her way to the store, Johnston passed a white car that was in a ditch. Upon Johnston's arrival at the store, she was "flagged down" by appellant. She immediately noticed that appellant had no shirt on and his pants were "covered in blood."

Appellant approached the patrol car and Johnston asked him whether "he was injured." According to Johnston, this was the only question she posed to Allen at that time. Allen

responded that he was unhurt and then "started talking," even though Johnston had not asked him anything. Johnston testified: "[Allen] said that he didn't know where he was. He didn't know who the person was. Didn't know where he was then. That he had stabbed a man ... and he was at—in a shack on top of a hill." Appellant told Johnston that "he wanted to leave" the shack, but "[t]he guy wouldn't take him home," so appellant "reached for the car keys and the man came at him, and [appellant] stabbed him." Appellant added that he "then got into the man's car, a little white car, and he got scared, and he left in the car." As appellant was looking for a phone, he "tried to turn around to come back to the store" and "hit a ditch." Johnston asked appellant where he had come from, and appellant stated that "there was a shack on a hill on a dirt road." Johnston spent about three to five minutes talking to Allen.

Johnston recalled that Officer Jonathan Burroughs and Sergeant Daniel L. Gimler soon arrived at the scene, and appellant volunteered to show them where the shack was located. Appellant was handcuffed just before he entered Officer Burroughs's car, and the three officers went with appellant to the scene of the stabbing. At the scene, appellant remained in the car while Sergeant Johnston stood outside the vehicle; the other officers went inside the victim's residence.

Officer Burroughs testified that, on the way to the Ironsides Store, he stopped to examine the wrecked vehicle that the caller had reported, and saw a blood soaked shirt inside. At the store parking lot, Officer Burroughs saw appellant standing near Sergeant Johnston's vehicle. Johnston informed Burroughs that appellant had been involved in a stabbing, but appellant did not know the location of the victim. At the store parking lot, Burroughs spoke with appellant for five to ten minutes.

According to Burroughs, Sergeant Gimler arrived shortly thereafter. While Johnston conferred with Sergeant Gimler, Burroughs "turned [his] attention" to Allen and asked appellant "what happened. If he knew the location of the victim."

Appellant was a few feet away from Burroughs at the time. Burroughs testified:

> He stated that he had stabbed the victim and had left the scene driving . . . in a car that he had crashed. . . .
>
> I asked him just a little further to describe what had happened. He said that he had come home with the victim the previous night, gotten up in the morning and attempted to leave. He said at that point he was confronted by the victim, who had his hands up in a fighting stance, he put his hands up.
>
> He said he didn't know if the victim had a weapon or not, and at that point observed a knife on the counter, I guess in the kitchen area, and picked it up and stabbed the victim a few times; took his car keys and fled the scene. And wrecked the vehicle on 425 while attempting to execute a U-turn.

Burroughs asked appellant "what led up to the stabbing" and "how many times he stabbed the victim, be specific regarding that." Appellant responded that "[h]e didn't know. He just kept stabbing him and stabbing him." Allen also indicated that the victim was located in "a shack on a hill." At that point, Burroughs handcuffed appellant and placed him in the back of Burroughs's vehicle. However, Burroughs explained to appellant "[t]hat he was not under arrest." Rather, "this was just being done for safety because we didn't have the full story." Burroughs also told appellant that he was handcuffing him "because of the exigent situation we were trying to find the victim." Appellant indicated that "he understood."

It took only three to five minutes to drive from the Ironsides Store to the victim's residence. During the drive, Burroughs conversed with appellant about landmarks in an attempt to find the victim's residence. Burroughs described appellant as "cooperative." According to Burroughs, upon seeing the victim's residence, appellant "excitedly stated that it was the house on the hill, that's it, up on the hill." Burroughs entered the house and found the decedent, John Butler. When Burroughs returned to the vehicle a few minutes

later, appellant inquired about the victim's condition. Burroughs responded that "at that point we weren't sure what the situation was and he would be informed when we knew more."

At the request of Almassy and Detective Jay Budd, Burroughs transported appellant to Rose Hill Farm, a produce stand near La Plata, "so they could speak to him." Burroughs arrived about five to six minutes later and removed appellant's handcuffs. By then, Allen had been handcuffed for about fifteen to twenty minutes.

On cross-examination, Burroughs testified that he completed a police report that included the circumstances under which he spoke with appellant; he omitted his statement to appellant, in which he advised appellant that he was not under arrest. Burroughs also indicated that he did not notice any marks or bruises on appellant.

Detective Almassy recalled that he met the group at Rose Hill Farm at about 10:30 a.m. Almassy asked Officer Burroughs why appellant was handcuffed, and Officer Burroughs responded that he was handcuffed "for safety reasons." Almassy stated that, when he first saw appellant, he knew only minor details regarding the incident, as reported by appellant during his call, and thought that appellant might actually be the victim. Almassy had no information about any statements that appellant had made while at the Ironsides Store.

Almassy asked appellant if he would be willing to "discuss the incident." He also told appellant that he was "not under arrest"; that he was "free to leave"; and that he did not have to discuss the incident. According to Almassy, appellant "agreed to ride" to the sheriff's office with Almassy and Detective Budd "to discuss what happened." Appellant sat in the front passenger seat of Budd's car, without handcuffs, while Sergeant Almassy sat in the rear. Almassy maintained that he engaged only in "small talk" with appellant during the ride to the sheriff's office. However, because appellant had blood on his hands and face, on his upper body, and on his jeans, Almassy told appellant that he could not wash off any of

the blood, because he wanted to take photographs to document appellant's condition.

At the sheriff's office, appellant was taken to an interview room. At 10:55 a.m., Sergeant Almassy entered the room and reiterated that appellant "was not under arrest and was free to leave and did not have to discuss the incident" with the police. Appellant agreed to the interview. It is undisputed, however, that appellant was not advised of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). For the next two hours, Allen recounted the events that led to his repeated stabbing of Butler.[2]

Almassy maintained that his entire conversation with appellant was conducted in normal conversational tones. Moreover, Almassy claimed that he never demanded that appellant speak with him or provide a written statement. And, appellant was given drinks and snacks.

After appellant provided his oral statement, he agreed to provide a written statement. At 12:56 p.m., Almassy began typing his questions and appellant's answers on the computer, so that appellant could read them. Almassy claimed that he typed the answers verbatim, and appellant made only a few corrections. The written portion of the interview ended at 3:56 p.m.

Allen's first written statement reflects the following:

[ALMASSY]: Jeffrey, I'm detective Almassy of the Charles County Sheriff's Office. We're seated in interview room number 224 in the Charles County Sheriff's Office Headquarters building. I would like to talk to you about the stabbing which occurred this morning.

*When I first made contact with you this morning, did I advise you you were not under arrest, and were free to leave at any time?*

[APPELLANT]: *Yes.*

---

2. In our discussion of the evidence adduced at trial, we shall refer in detail to the content of Allen's various statements.

[ALMASSY]: *Did you understand what I told you at that time?*

[APPELLANT]: *Yes.*

[ALMASSY]: When we arrived in this interview room, did I again advise you you were not under arrest, and were free to leave at any time you wanted to?

[APPELLANT]: Yes.

[ALMASSY]: Did you understand what I told you at that time?

[APPELLANT]: Yes.

[ALMASSY]: Can you tell me what led up to this stabbing, and what happened during the incident?

\* \* \*

[ALMASSY]: How far did you go in school?

[APPELLANT]: I was an A student, eleventh grade.

[ALMASSY]: Do you know how to read, write, and understand the English language?

[APPELLANT]: Yes.

[ALMASSY]: Have I made any promises or threatened you in any way for this statement?

[APPELLANT]: No.

[ALMASSY]: Have I treated you fairly during my contact with you today?

[APPELLANT]: Yes.

[ALMASSY]: After having read this statement, will you agree to sign the bottom of each page to verify its accuracy?

[APPELLANT]: Yes.

Following the completion of the written statement, Sergeant Almassy asked appellant to read two questions out loud to ensure that appellant was literate. Those questions were: "When I first made contact with you this morning, did I advise you you are not under arrest and were free to leave at any time?", and "Did you understand what I told you at that time?" Appellant answered "yes" to both questions.

By the time the interview was over, Sergeant Almassy had learned that appellant lived with his girlfriend in Washington D.C. He offered to transport appellant to his girlfriend's residence, or wherever else Allen wanted to go. Appellant indicated that he wanted to go to his parents' home in Prince George's County. Appellant was provided with a jumpsuit in exchange for his pants. Almassy and Budd then drove appellant to his parents' house, arriving there at about 4:30 p.m. Once there, appellant's father gave Allen a pair of shoes so that the sheriffs could take possession of the bloody shoes appellant was still wearing.

In the meantime, Almassy instructed Detective Joseph Piazza and Detective Paul Gregory to respond to the area where appellants' parents resided. They were told to remain at that location to monitor appellant's movements. Sergeant Almassy also instructed Sergeant Bryant to apply for a statement of charges, and to notify Almassy when the arrest warrant was issued. At about 4:45 p.m., Sergeant Bryant obtained the arrest warrant.

Detective Piazza testified that he was assigned to conduct surveillance of appellant after Almassy dropped Allen off at his parents' apartment. He saw appellant exit the apartment building a short time later and enter a vehicle that was headed in the direction of Washington, D.C. As Piazza followed the vehicle, he learned that an arrest warrant had been issued for appellant. At about 5:10 p.m., as appellant and his parents drove away from the apartment building, the officers initiated a vehicle stop and arrested appellant. Detective Budd handcuffed appellant and Detective Piazza gave appellant his *Miranda* warnings. Approximately twenty-five minutes had elapsed between the time that appellant had been dropped off at his parents' home and the time of the vehicle stop. Almassy and Budd then transported appellant back to the sheriff's office.

Upon arriving at the sheriff's office for a second time, appellant was again advised of his *Miranda* rights. Almassy asked Allen whether he would submit to another interview,

because Almassy "wanted to go over some of the things they had previously talked about to make sure that the information that I had talked to him earlier was accurate." Appellant agreed, and orally repeated his account of the events. Almassy then asked appellant to provide a second written statement, and appellant complied.

The second written statement began at 7:45 p.m. Upon reviewing the written statement, Allen made some changes, and then signed each page. Almassy stated that, while he was typing appellant's second statement, appellant asked whether he needed an attorney. Almassy testified:

> [Appellant] asked if I believed that he needed an attorney. And I told him that that was his decision to make. That was not a decision that I could make for him.
>
> At that point, I asked him if he wanted an attorney. He looked at the monitor where the statement was being— where you could observe the statement that I was taking, and told me, let's go on.

The defense did not present any evidence at the hearing. Defense counsel argued that, because of *Miranda* violations, appellant was entitled to suppression of all the statements he made, beginning with the statements made at the store parking lot. Appellant's lawyer maintained that the officers were required to provide appellant with his *Miranda* warnings because, for purposes of the interrogation, Allen was in custody.[3] According to Allen, no reasonable person in his position would have felt free to leave or terminate the questioning. The defense also asserted that appellant's second written statement, although made after appellant was advised of his *Miranda* rights, should have been suppressed as the tainted "fruit of the poisonous tree."

The State argued, *inter alia*, that the conversation that occurred in the police car on the way to the victim's home fell

---

3. Appellant also argued below that some of his statements were coerced and thus involuntary. On appeal, Allen has not renewed his involuntariness claim.

under a public safety exception, because the officers were trying to find the victim, who could have been alive and in dire need of medical attention. In addition, the State observed that appellant was only in handcuffs for less than fifteen minutes. Further, the State asserted that appellant's statements were made voluntarily, because the officers told appellant that he was free to go.

With regard to appellant's call to the sheriff's office, in which he notified the police that he had stabbed someone, the trial court said:

> The first of such statements he made upon someone calling for him the Charles County Sheriff's Department at his request, so that he could report that he had been involved in a stabbing, and it was a statement made to a dispatcher with the Sheriff's Department, which apparently has been recorded and has been transcribed and it's [sic] admissibility is not contested because there is no question but that it is a statement that was made freely and voluntarily by the Defendant, at a time when he was not in the custody of the police or subject to any police interrogation.

As to the statements made to Johnston at the store parking lot, the court denied appellant's motion, stating, in part:

> [T]he statement made ... to Officer Johnston ... I would find that those statements were freely and voluntarily made by the Defendant without any promises or coercion on the part of Officer Johnston. That those statements were made by the Defendant when he was not, nor would any reasonable person believe under the circumstances, that he was in the custody of the Charles County Sheriff's Department.
>
> Indeed, many of those statements were not even in response to questions made to him by the officer. They were simply statements that this Defendant, who had summoned the officer to the scene, for the purpose of giving the officer information was voluntarily giving to the officer.

Similarly, with regard to appellant's statements to Burroughs at the store parking lot, the court found appellant was not in custody. The court explained that appellant had sum-

moned the police and "the police were just trying to figure out what was going on." The court said, in part:

> All of those statements were made to the officer, I find freely and voluntarily by the Defendant. Those statements were, in fact, in response to the questions that the officer was asking. So they were in response to interrogation by Officer Burroughs.

> But, I would find that the Defendant did not, nor would any reasonable person under the circumstances have believed that he was in the custody of the police when he was making those statements. Again, it was the Defendant who had summoned the police to this location. And up to that point, the police were just trying to find out what was going on. Why does this guy want us here. Why's he got blood all over him. He's telling us he stabbed somebody. Who's he stabbed. Where did it occur, things of that nature. He's not in custody. And nobody reasonably would believe, under these . . . circumstances, that he's in custody.

However, the court found that appellant was in custody when he was handcuffed in the sheriff's cruiser. It said:

> Now, once a police officer puts handcuffs on your person, I think a reasonable person would believe he's in custody of that police officer. . . . If that police officer then put me in the back seat of his car, and I couldn't get out of that car, and that police officer himself was of the opinion that I wasn't free to go, then I think it behooves the State to concede that, in fact, the fellow was in custody because the police officer thought he was. This man is in my custody. He is not free to go.

> Have I arrested him? No, I haven't arrested him, but he's in my custody and he's not free to go.

> And *Miranda* doesn't talk about people who are under arrest, although it includes people who are under arrest. *Miranda* talks about in custodial interrogations, which include interrogations of people who are in custody under arrest, and interrogation of people who are in custody not under arrest.

Any questions that were asked of the Defendant by Officer Burroughs after that point, were asked in violation of *Miranda*. And any questions that were asked of him to that point, in my opinion, any responses made by the Defendant to his questions would be inadmissible.

Despite the court's finding that appellant was in custody while in the police cruiser, it did not exclude Allen's assertion, "that's the house," made while in the police car. It said:

And I would find that, even though the Defendant was in custody and subject to his *Miranda* warnings at that point, that that statement wasn't given in response to an in custodial interrogation and would be admissible.

I don't accept the State's argument that there is some public safety factor here that excepts *Miranda* from being given under the circumstances of this case. But I find, in fact, that that particular statement wasn't given in response to any questioning by the police officer.

With the exception of that statement, any other statements made to Officer Burroughs, from the time that Defendant was placed in handcuffs and put in his car until the time that he was delivered to Detectives Almassy and Budd, will, in fact, be suppressed.

As to the statements that appellant provided to Almassy at the station during the first interview, the court found that appellant was not in custody. The court explained:

Now, I guess if one can reasonably feel from facts that they're in custody, there are things that can be done that would change somebody's opinion as to whether or not he's in custody. And when the Defendant arrived at the Rose Hill Farm and was delivered ... by Officer Burroughs to these two detectives, he was taken out of his handcuffs. He was not re-handcuffed by the officers. The officers told him he was not under arrest and he was free to leave.

The Defendant understood that, I find not only by what he said to the officers at the time, but by his response in this written statement, State's Exhibit Number 2, do you understand what I told you at that time, and that was right

after his question when I first made contact with you this morning, did I advise you you were not under arrest and were to leave at any time. And the Defendant responded, yes. Do you understand that at this time, or at that time. Yes. And then the officer says, when we arrived at this interview room, did I again advise you that you were not under arrest and were free to leave at any time you wanted to go. And the answer was, yes. And then another question, do you understand what I told you at that time. He answered yes.

What we have to do in determining whether or not a reasonable person would believe that he or she was in police custody is look at the totality of the circumstances. The Defendant was released by Detective Burroughs, turned over to—Officer Burroughs turned over to the detectives, that he was taken out of handcuffs, that he was not placed back into handcuffs, that he was advised by the detectives that he was not under arrest and that he was free to leave at any time.

The Defendant understood that. The Defendant voluntarily chose to go with the detectives to the Charles County Sheriff's Department. There's some argument made that he didn't know where he was and that that has some bearing on the fact that he would reasonably believe that he was in custody.

These's [sic] some argument that he didn't have his clothes and that he took his shoes and stuff, of course they didn't take his clothing and his shoes until after the interrogation ended. And they did that with his consent.

The argument is made that he wasn't allowed to wash blood off of his person. And that is, in fact, true, but I don't see how that, again, factors into whether or not somebody believe[s] or doesn't believe that he's in custody and not free to go. Especially somebody who admits in his statements and by his words that he understands that. And he's not being treated by the officers as if he is their prisoner or as if he is in their custody.

I would find that this statement, both oral and written statements made to Sergeant Almassy by the Defendant that's 1256 hours, it's the written statement is dated that. The oral statement, obviously preceded that, is not the subject of any in custodial interrogation of the Defendant by the police. That the Defendant knew, that any reasonable person in the position of the Defendant, would have known that he was not in custody and free to leave. That the Defendant made these statements freely and voluntarily.

I find that there was no coercion. No promises or inducements made by the Sheriff in order to get him to make this statement. That there were no inappropriate, illegal tactics employed by Sergeant Almassy or anybody else in the Sheriff's Department to get the Defendant to make a statement.

Again, we always have to go back to the original premise. It's the defendant who called the police, who told them that he wanted to talk to them about this. It's the defendant who did, in fact, voluntarily tell the police what was going on.

Not surprisingly, the court found that the second interview amounted to a custodial interrogation. Nevertheless, it ruled that the statements made at that time were admissible, stating, in part:

We have an in custodial interrogation made of the Defendant later in that day. After the Defendant gave the first statement, he was provided with some clothing by the Sheriff's Department. He was allowed, at his request, to call his father. He was taken by members of the Sheriff's Department to Prince George's County, where he met with some family members....

He was released by the Sheriff at that time, that is they let him go to his father as they had told him he was free to do at any time he wanted to. And they let him go then as they had always indicated they would do.

And then, based upon the totality of the information the Sheriff had learned, Officer Bryant applied for a statement

of charges, accusing the defendant of first degree murder. The application for statement of charges, sworn to by the officer, or in part of Defendant's Exhibit Number 1, the statement of charges issued by the District Court Commissioner form the basis, also of that part of the basis of that Exhibit.

It was pursuant to that warrant issued in connection with that statement of charges that the Defendant was taken into custody, returned to the Charles County Sheriff's Department, advised of his *Miranda* warnings, properly advised of his *Miranda* warning[s].

I would find that the Defendant understood those *Miranda* warnings and that he freely and voluntarily weighed them. And he made the statements to the defendant that form Exhibit Number 3 for the State, and the oral statement that preceded Exhibit Number 3. And I would rule that those statements are also admissible in evidence, and deny the motion to suppress them.

## B. Trial

The State played for the jury appellant's 911 call to the sheriff's office, made at about 9:45 a.m. on October 24, 2001. It also introduced a transcript of the call, in which appellant identified himself by name. Allen said: "[L]ast night I was with this guy and ... he tried to make me do things that I didn't want to do, with him. And he came at me and then ... I cut him and I had his car and I was trying to find a police department...." Allen also stated that the car was in the ditch with a bloody shirt inside the vehicle. Appellant indicated that he would wait for an officer at the "Ironside" Store.

In response to an inquiry from the 911 operator, appellant said: "I just stabbed him and ... I got in the car and I ran." When asked if "this guy" had "assault[ed]" appellant, Allen said, "no." Appellant explained:

What happened was, last, last night I had a lot on my mind, so I had intended to, to, I, my mind, I, I point, I, I thought about doing this, but then after I said that I went to sleep

and I woke up this morning and I was saying man I got to go, and he was cussing me out my—you got to do this I came all the way, brought, then he said, well I'm not taking you home. So I grabbed the keys, it, which was in the, in the kitchen and I was going outside to the car and he came at me, and when he came at me, there was a knife laying on the, on the, on the frigerator, and I got it and I just, just, you know, I was scared I didn't know what he was going to do.

Walter Carter testified that, on October 24, 2001, appellant flagged him down from the side of the road, where a white car was in a ditch. Appellant's pants were covered in what Carter thought was red paint. Appellant wanted to call the police, so Carter drove him to the Ironsides Store "to use a phone." On the way, appellant told Mr. Carter that he "was at a club in D.C. And that ... two guys had picked him up and brought him to some house in Charles County. . . . And that he had to fight his way out 'cause they was gay, he didn't go that way." Carter denied that appellant told him he had been kidnapped.

Sergeant Johnston, Officer Burroughs, and Detective Piazza all testified to the events of October 24, 2001, consistent with their testimonies at the suppression hearing. Therefore, we need not repeat their accounts.

Officer Jason Carlson was instructed to report to the scene where the car had run off of the road. He noted that the keys were still in the ignition of the vehicle, and a T-shirt that appeared to be stained with blood was on the floor in the area of the front passenger seat. A motorist, Walter Carter, stopped to speak with Carlson, and reported that he had picked up the driver of the car and took him to the Ironsides Store to make a phone call. Carlson testified about what Carter told him appellant had said to Carter:

[T]he night before he had met some guys who he believed were females and that they had in turn ended up kidnapping him and driving him around and during that incident a fight ensued amongst the individuals who had kidnapped him and himself and he was able to break free and take the car. He

also stated that he had been driving around the woods all night trying to find his way out and had got stuck in the ditch.

Cinnamon Lewis had known the victim, John Butler, for over ten years. Describing himself as "a pre-op transsexual," Lewis testified that, on the evening of October 23, 2001, while Lewis was dressed as a woman, Butler drove Lewis and Mr. Lewis's cousin, James Owens, to an area in Washington, D.C. known as "The Stroll." According to Lewis, "The Stroll" is a well known area in the gay community where "gay people go at to meet other gay people. It's ... a meeting spot where men meet men." Lewis stated that Butler was "attracted" to men but dressed "like a regular man."

When the group arrived at The Stroll, they "cruised ... around" and saw appellant, who "walked over to the car." Mr. Lewis recalled that appellant asked Mr. Lewis if he could go home with Mr. Lewis. When Mr. Lewis told appellant "no," appellant asked Mr. Butler if he could go with Mr. Butler. Butler said, "yeah." Appellant got in the back seat with Mr. Owens; Mr. Lewis then invited another person to join them, who also got in the car. The entire group proceeded to Lewis's house in Charles County. Upon arrival, Owens, Lewis, and the other passenger exited the vehicle; appellant then got into the front seat with Butler. After Lewis and Butler agreed to meet at 9 a.m. on October 24, 2001, to attend the funeral of a mutual friend, Butler drove off with appellant. That was the last time Mr. Lewis saw the victim.

Technician Richard Brown testified that, on October 24, 2001, he examined the victim's residence, a two-room cinder block structure with a port-a-john outside and two doors leading outside, one in the kitchen and one in the living room. Blood was found on the refrigerator door, the doorknobs to the kitchen, and the walls and ceiling of the living room. The victim was located on a couch and had stab wounds to the upper left chest, left ribs, left neck, and left thigh. A blood-covered kitchen knife was located next to the victim's left

hand. Brown also found a small knife underneath the couch cushion. No fingerprints were recovered from the knives.

At about 11:00 a.m. on the date in question, Technician James Ammons examined the abandoned car in the ditch. The vehicle was partially "off the traveled part of the roadway with the nose end, which would have been pointing to a[sic] easterly direction." Moreover, the car was unlocked, "the ignition was in the 'on' position, the radio was playing, the front end was damaged and [there was] damage to the left rear." Ammons found blood on the driver's side door handle and a T-shirt on the floor of the front passenger side with blood on it. In addition, there were skid marks in the road across the yellow line that ended in the gravel on the shoulder of the road.

Ammons examined appellant and found no wounds on him. After appellant was provided with a jumpsuit, Ammons took appellant's clothes. They were admitted into evidence, although the State did not introduce evidence regarding any forensic testing.

Dr. Joseph Pestaner, the Assistant Medical Examiner, performed the autopsy. He opined that Mr. Butler's death was a homicide, caused by multiple stab wounds. In particular, Dr. Pestaner testified that Mr. Butler sustained wounds to the right side of his face, neck, shoulder, armpit, and hand, as well as the left side of the chest. Because of the severity of the wounds, Dr. Pestaner estimated that the victim survived somewhere between a couple of minutes to an hour. Dr. Pestaner also testified that the stab wounds to the hand were "consistent with the struggle, characterized as defensive type wounds, where you are trying to defend yourself and injuries that would be on your hands on the backs of arms where you are trying to protect yourself. . . . "

The victim had a blood alcohol content of .04. In addition, Dr. Pestaner noted that the victim had used cocaine within the last day, but he opined that it would not have affected the victim's mental state at the time of his death.

Detective Almassay testified that he responded to Rose Hill Farm, but "did not know ... whether or not there was a deceased victim"; he only knew that a stabbing had occurred. Almassay met Officer Burroughs and appellant in the parking lot. Appellant was in handcuffs, and Almassy asked Officer Burroughs to remove them. Almassy then "asked [appellant] if he would be willing to respond back to the Headquarters building with Detective Budd and I and I told him he was not under arrest and I just wanted to get his version of what had occurred." Appellant agreed, and got into the front seat of the unmarked police vehicle, without restraints. At the Sheriff's Office, Almassy again told Allen that he was free to go at any point. Detective Almassy added that he never promised or threatened appellant, and appellant "appeared calm, normal, nothing that stood out."

Appellant talked with Almassy for two hours. Almassy related appellant's oral statements, as follows:

[At] approximately one o'clock that morning [i.e., October 24, 2001] [Allen] was walking on the sidewalk in Washington D.C. and as he was walking down the sidewalk he heard somebody holler out to him. When he looked up he observed what he thought was a female waving to him from the passenger window of a vehicle. The vehicle drove a short distance down the street and made a U-turn and pulled up to the curb next to him.... [Allen] said that he realized that it was not in fact a female it was a male dressed in female's clothing and that person identified themselves as Cinnamon and he began to talk to the people that were in the vehicle.

[Allen] said that the victim was driving.... Shortly thereafter he got into the back seat of the vehicle with them through the driver's door....

[Allen] said they drove a short distance down the street, approximately a block and Cinnamon started talking to another male that was walking on the sidewalk. They pulled over and Cinnamon exited the vehicle, they walked a short distance away from the vehicle and a short time later came back and the male that the second male [sic] that was

walking down the sidewalk got into the back seat through the passenger door and Cinnamon got back into the vehicle.

Allen told Almassy that, after the group picked up the fifth passenger, they drove to Mr. Lewis's house in La Plata. Upon arrival, three of the people exited the car. Butler and Lewis planned to meet the next morning to attend a funeral. Appellant then got in the front passenger seat and drove with Butler to the victim's residence.

Almassy continued his testimony as to appellant's oral statement:

[T]hey both went inside, he sat down on the couch and the victim turned on the television and sat there. . . . Shortly thereafter the victim went outside of the residence and approximately 15 minutes later he got up and looked out the front door and he saw what he saw [sic] was a flash from a lighter.

At that point the victim told him that he would be back in shortly. He said that he went back and sat down on the couch. He sat there for a few minutes and at that point he got up and looked around for a restroom and walk [sic] into the kitchen and didn't find a bathroom and went back and sat down on the couch. . . .

He said a short time later the victim came back into the residence, he was in the kitchen. He said that he was only in the kitchen for a few minutes, turned off the kitchen light and came into the room where he was seated on the couch. He said the victim offered him a beer. . . .

He said at that point the victim got in bed . . . and got under the covers and the victim told him at that point to get comfortable and he got up and removed his pants and shoes and his socks and said that he moved over and sat on the couch, which was next to the victim's bed. And at that point he said that he asked himself what the hell am I doing as he sat down on the couch. . . .

At that point he said that he took a couple more sips from the beer and put the beer down and laid down on top of the covers on the bed next to the victim. . . . He said that he

was smoking a cigarette ... and ... after he finished the cigarette he began to doze off again.

According to Detective Almassy, appellant claimed that the victim woke him up a short time later by initiating oral sex upon appellant. At the victim's request, appellant then engaged in anal intercourse with Butler. Afterwards, appellant "went to sleep."

Appellant told Detective Almassy that he woke up at around 9:00 a.m. and asked the victim if he still planned to attend the funeral of his friend. The victim indicated that he was not going to do so. Appellant was upset, and said: "I'm ready to get the fuck out of here." As recounted by Almassy, appellant related the events that culminated in the stabbing:

[T]he victim told him to chill out and go in the kitchen and get a beer or something. . . . He went into the kitchen to get a beer and opened the refrigerator and saw a rat in the refrigerator and at that time he decided that it was time for him to leave. . . . He said the victim was still lying on the mattress. . . . He told the victim that he needed to get up and take him out of there. The victim told him I think he said oh, baby just wait a minute. . . .

[Allen] was just trying to figure out a way that he could get the victim to get out and get him out of there. . . .

He indicated that he remembered seeing the victim's keys on the stove in the kitchen. At that point he told the victim that he would drive himself out of there and he picked up the victim's keys and jingled the keys. . . .

He told the victim that that is all right I will just drive myself out of here. . . . He said that the victim got up and said wait a minute damn it and began to approach the kitchen doorway. . . . He said as the victim approached him he moved towards the victim. . . .

He said that once the victim began to approach him he dropped the keys and grabbed a knife out of a holder on top of the refrigerator and they met in the doorway leading from the kitchen to the area where the couch is and the bed were located. . . . He said that he initially he heard [sic] as

fidgeting in the room where the ... victim was located. When the victim came into his view that he was holding his blanket in front of him. . . .

He said that they met in the doorway and the victim as he approached raised his left hand ... which was the hand that he was holding the blanket in. He said that once they made contact ... he pushed the victim back into the room where the mattress and the couch were on the floor. . . .

According to Almassy, Allen did not say anything "at that point about feeling scared." The prosecutor asked Almassy about the first contact between appellant and Butler "in the area of the doorway." Almassy testified:

[Allen] said as he pushed the victim back the victim tripped on the mattress that was on the floor and began to fall backwards. . . . At that point that is when he stuck him the first time and he wasn't sure if he stuck him or swung and cut him as he was falling backwards. . . . He said that the victim fell back on to the bed. He indicated that he was on top of the victim stabbing the victim. While he was describing to me how he was stabbing the victim he was motioning front to back over the head motion with his right hand.

Detective Almassy noted that appellant was unable to recall how many times he had stabbed the victim. But, Allen stated that he stabbed Butler until the victim had "no more fight left." Almassy testified:

[H]e [said he] got up and ran towards the telephone and then he remembered that the victim had previously told him that the telephone was not working. At that point he ran in and picked up the car keys and ran out of the door of the residence. . . .

He said that he ... left the area in the victim's vehicle. He said that he drove and made a couple of turns and at some point lost control of the vehicle. . . .

He said that he flagged down an individual driving by in a Ford Explorer and he asked that individual if he would help him either push the car out of the roadway or pull the car

out of the ditch. The gentleman told him he wouldn't be able to help him with the vehicle and at that point he asked him if he could give him a ride to the telephone so he could call the police. . . .

He said initially they went to what he thought was a fire department and there was no answer at the door at that point they took him to a store where he called the police and it was the Ironsides Store.

After appellant provided his oral statement, Almassy asked Allen if he would provide a written statement; appellant agreed. Almassy claimed that he wrote down appellant's answers to questions verbatim and gave appellant an opportunity to review the written statement; appellant changed a couple of words in the finished statement and then signed it. The written statement, largely consistent with the oral statement, was admitted into evidence.

In the question and answer portion of the written statement, appellant was asked whether the victim had threatened him. Appellant responded: "No he didn't, not to say to me that he was gonna do anything." Appellant also acknowledged that he "didn't see [Butler with] a weapon." Explaining why he took Butler's keys and car, Allen said:

So I tried again to get him up, and he just wouldn't get up. So I thought I saw his keys on the stove, so I thought if he heard the keys jingling, and I told him I'd drive myself out of here, I thought that would make him get up. So I picked the keys up and said that I'll drive this mother fucker out of here myself. So I picked the keys up and they jingled, and I heard him say wait a minute dammit. And I heard something like some fidgeting or something, so I headed back toward the room where he was. And as I was headed in, he was headed out to where he was. He ad [sic] the blanket draped over his arm . . . and he had it not balled up, but draped over and it was lifted up and he was carrying it like, it wasn't like it was balled up, but it was picked up. And when I saw that, I threw the keys down, well I dropped the keys, and looked on top of the refrigerator and saw

some knives. I just reached up there and grabbed the knife, then he came at me with his left arm up, under the blanket. And I went and pushed him, I pushed him back into the room. And his arm was still up like he was trying to grab me or something, he fell down to the bed, and looking up I could still see his arm coming, then I just kept stabbing him.... So I ran toward the telephone, and remembered him telling me that the telephone was not on. So I ran into the kitchen and picked up the car keys off the floor, ran out the door, and got into the car and drove off. I was scared, I didn't know where I was, and really at the time, what to do....

Consistent with his testimony at the suppression hearing, Almassy testified that, after the interview, Allen was transported to his parents' residence. About twenty-five minutes after appellant arrived at his parents' home, he was arrested. Detective Piazza advised appellant of his *Miranda* rights at the time of his arrest. Appellant was then transported to the sheriff's office, where he was again advised of his *Miranda* rights. Allen agreed to provide another oral and written statement. Those statements were introduced in evidence. Because they are largely consistent with appellant's earlier statements, we need not repeat them.

At the conclusion of the State's case, appellant moved for judgment of acquittal. He argued that no evidence existed to support the robbery charges, because no evidence had been presented regarding appellant's intent to steal at the time the force was applied. The court denied the motion.

Appellant, who was forty years old at the time of trial and is the father of three children, was the sole witness for the defense. He stated that on October 23, 2001, as he was walking down the street in Washington, D.C., "someone hollered out of a car" to him. Allen thought the person was a woman. He later learned that the person is named Cinnamon and is actually a man. Two other people were in the car at the time. According to appellant, he was asked if he "wanted to come back" and "hangout" [sic]. Appellant agreed. Allen

added that he knew that The Stroll was known to be an area where homosexual men gathered, so he had "a pretty good idea" of why a car would stop next to him.

Allen recalled that a few moments after he got in the car, Lewis again yelled out of the window and spoke to another man. According to Allen, that person also entered Butler's car, bringing to five the total number of people in the vehicle. The group proceeded to LaPlata, where Butler dropped off Lewis and two others at Lewis's residence. Then, he and Butler continued to Butler's residence, which appellant described as a "shack on the hill."

At the victim's residence, appellant followed Butler inside and sat down on the couch. Appellant said: "Then he went back outside and he stayed outside for about 15 to 20 minutes and I got up and went to the door to see if I was left there and when I opened the door I saw a light flickering like someone was smoking [crack cocaine]." Mr. Butler returned, went into the kitchen, brought out a couple of beers, and "laid down on the bed." Butler suggested to appellant that he "get comfortable," so appellant removed some of his clothes. Then, the two men engaged in consensual "sexual relations." Afterwards, Allen "went to sleep."

Appellant woke up around 9:00 a.m. and asked the victim if he was going to the funeral with Mr. Lewis, as had been planned, because appellant was ready to leave. The victim said he was not going. Appellant recalled: "So I went to the refrigerator to get a beer and as I opened the door it was like from under the bottom of the refrigerator a rat ran into the refrigerator and it startled me and so I said well, I told myself, I said I got to get out of here. So, again, I asked him I said you know can we get out of here I am ready to go." Because Mr. Butler "ignored" Allen, appellant picked up Mr. Butler's keys and shook them to "persuade [Butler] to get up." Appellant said to Butler, "if you won't get up to take me I will just drive out of here myself." Appellant claimed, however, that he never actually intended to take the victim's car.

Appellant recalled: "It looked like something was being knocked over and I heard him say wait a minute damn it and I was already headed toward the living room area. I was standing maybe this far away from the threshold of the door and as I got closer I could see Mr. Butler coming from the right of that room . . . ." Appellant saw that Mr. Butler "had the blanket draped over his arm and the other part he was holding it up, holding it off the ground or keeping his self covered up, I don't know." Appellant then dropped the keys and grabbed a knife and began swinging. Allen recalled: "[H]e was coming towards me and I sort of simultaneously pushed him and swung the knife at the same time." The following colloquy is pertinent:

[APPELLANT'S ATTORNEY]: And after the incident what did you do?

[APPELLANT]: Well, I reached down and I felt, I grabbed the knife and was trying to pull the knife up and I heard something, something pop like and, you know, I heard it, I paid attention to it but then Mr. Butler was like trying to, I guess I am going to call it wrestle his way up at me again, and I didn't know if he had the other knife in his hand or what and, you know, I swung the knife again. I started swinging the knife again.

[APPELLANT'S ATTORNEY]: And after you stopped swinging the knife where did you go?

[APPELLANT]: Well, I got up and I headed toward the telephone and, you know, in that split second I remembered that the phone didn't work. He had told me earlier that the telephone didn't work and so I started, I ran in the kitchen and I picked up the keys and I had all this blood on my hands and I looked in the sink, I didn't see any, you know, any running water or a faucet or anything and I thought I— that I looked in the refrigerator to see if there might have been a jug of water in the refrigerator to pour on my hands to get some of the blood off. I didn't see it. I ran out and got in the car and I drove off.

Appellant left the residence in Butler's car and looked for a police officer. Because he was unfamiliar with the area, he got lost. As he was driving, Allen lost control of the vehicle and ran into a ditch. Then, he waved down a passing motorist, who took him to the Ironsides Store to call the police. Appellant contacted the police and tried to help them find the victim's residence.

On cross-examination, appellant admitted that he voluntarily went to the victim's house; the victim did not force him into the house; and he was never held against his will. Appellant also acknowledged that he never saw the victim with a knife and that Mr. Butler never threatened him. Appellant recalled, however, that he asked Mr. Butler several times to take him back to Washington, D.C., to no avail. He explained that he thought he would get a reaction from Mr. Butler by shaking Butler's keys at him. Allen also admitted that he drank and used drugs the night before the stabbing. The following colloquy is also noteworthy:

[PROSECUTOR]: Now, are you telling us at this point in time that you felt at that moment that your very—that your very life was in danger?

[APPELLANT]: As I told Detective Almassy when I saw Mr. Butler coming at me with his arm partially raised I told him that I saw something up like he had an object in his hand. He asked me, he said did you see a weapon. I couldn't say I saw a weapon and that is what I told him, no I didn't see a weapon.

\* \* \*

[PROSECUTOR]: [A]t that moment in time when you still have the keys in your hand, you are walking towards Mr. Butler, are you telling this jury that at that moment in time you honestly felt in fear for your life?

[APPELLANT]: Yes sir, I did. I am telling you that.

At the close of all the evidence, appellant unsuccessfully renewed his motion for judgment of acquittal.

We shall include additional facts in our discussion.

## DISCUSSION

### I.

Appellant contends that the trial court erred in denying his motion to suppress the various oral and written statements he gave to the sheriffs. Although appellant complains about "all of the statements made by the appellant to police from the time the police arrived at the Ironside[s] Store to the time the appellant was dropped off at his parent's house," most of his argument focuses on the oral and written statements made at the sheriff's office.

With respect to appellant's first interview at the sheriff's office, Allen asserts that he was "clearly in custody" and thus he was entitled to *Miranda* warnings. Because the detective failed to provide appellant with *Miranda* warnings, he contends that the court should have suppressed all the statements he made during that interrogation.

Regarding Allen's claim that he was in custody during the first interview, he argues that a "reasonable person" would have perceived that he was in custody. Noting that he had been handcuffed when placed in the police cruiser, Allen states: "The use of physical restraints is one of many factors to be considered under the totality of circumstances when determining whether an individual is 'in custody.' " Moreover, Allen claims that the subsequent removal of the handcuffs had no effect upon whether he reasonably believed he was in custody, because he was "taken by one officer and delivered to another officer for questioning, he was not allowed to change his clothes or clean the blood off of his body until after his first interview with Sergeant Almassy, and he was in an area unfamiliar to him, without a car and without a way home." Appellant also points out that "he was never out of reach of the police," and the sheriff even kept him under surveillance after taking him home, arresting him just a short time later.

In addition, appellant claims that Almassy's conduct amounted to "improper police tactics," because Almassy deliberately sought "to circumvent *Miranda* " and later capitalized

on those tactics. Indeed, Allen claims that during the first interview Almassy "did everything one would do during a custodial interrogation except read the appellant his *Miranda* rights." Accordingly, Allen challenges his second interview at the sheriff's office, even though by then he had received his *Miranda* warnings. Relying, *inter alia*, on *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), he asserts: "Because police officers should not be rewarded for intentionally violating *Miranda*, this Court should suppress the appellant's second written statement, which was given ... within two hours of the conclusion of the first written statement, as the fruit of the poisonous tree."

Our review of the trial court's ruling with respect to a suppression motion "ordinarily is limited to information contained in the record of the suppression hearing." *Cartnail v. State*, 359 Md. 272, 282, 753 A.2d 519 (2000); *see White v. State*, 374 Md. 232, 249, 821 A.2d 459, *cert. denied*, 540 U.S. 904, 124 S.Ct. 262, 157 L.Ed.2d 189 (2003); *Nathan v. State*, 370 Md. 648, 659, 805 A.2d 1086 (2002); *Rowe v. State*, 363 Md. 424, 431, 769 A.2d 879 (2001). We review that evidence in the light most favorable to the prevailing party. *Stokes v. State*, 362 Md. 407, 414, 765 A.2d 612 (2001); *Charity v. State*, 132 Md.App. 598, 606, 753 A.2d 556, *cert. denied*, 360 Md. 487, 759 A.2d 231 (2000). Moreover, in reviewing the ruling of the trial court, we recognize that it is the trial court's function "to assess the credibility of the witnesses." *McMillian v. State*, 325 Md. 272, 282, 600 A.2d 430 (1992). Therefore, we extend great deference to the fact-finding of the lower court, and accept the first-level facts as found by that court, unless clearly erroneous. *Ferris v. State*, 355 Md. 356, 368, 735 A.2d 491 (1999); *Argueta v. State*, 136 Md.App. 273, 278, 764 A.2d 863 (2001). However, this Court must make its own independent constitutional appraisal as to the admissibility of statements by reviewing the law and applying it to the facts of the case. *Crosby v. State*, 366 Md. 518, 526, 784 A.2d 1102 (2001); *Wilkes v. State*, 364 Md. 554, 569, 774 A.2d 420 (2001); *Whittington v. State*, 147 Md.App. 496, 515, 809 A.2d 721

(2002), *cert. denied,* 373 Md. 408, 818 A.2d 1107, *and cert. denied,* 540 U.S. 851, 124 S.Ct. 136, 157 L.Ed.2d 92 (2003).

█ It is pellucid that the application of *Miranda* is triggered only in a custodial setting. *Miranda,* 384 U.S. at 441, 444, 86 S.Ct. 1602; *see Yarborough v. Alvarado,* —— U.S. ——, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004); *Thompson v. Keohane,* 516 U.S. 99, 107, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995); *Fenner v. State,* 381 Md. 1, 9, 846 A.2d 1020 (2004); *Hughes v. State,* 346 Md. 80, 87, 695 A.2d 132 (1997). Whether a person was in custody during police interrogation is a legal question, which we decide *de novo. See State v. Rucker,* 374 Md. 199, 207, 821 A.2d 439 (2003) ("In determining whether there was custody for purposes of *Miranda,* we accept the trial court's findings of fact unless clearly erroneous," but " '[w]e must . . . make an independent constitutional appraisal of the record to determine the correctness of the trial judge's decision concerning custody' ") (citation omitted); *McAvoy v. State,* 314 Md. 509, 515, 551 A.2d 875 (1989) ("Armed with the facts properly found by the trial judge, we must . . . make an independent constitutional appraisal of the record to determine the correctness of the trial judge's decision concerning custody."); *Ashe v. State,* 125 Md.App. 537, 549, 726 A.2d 786 (1999) ("Whether appellant was in 'custody' when he made the incriminating statement is a legal question, which we decide *de novo* using the facts found by the circuit court."). Accordingly, we begin with an examination of the trial court's finding that appellant was not in custody during the first interview conducted by Almassy.

██ " '[C]ustodial interrogation' " means " 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *Alvarado,* 124 S.Ct. at 2147 (quoting *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602). " 'Custody' ordinarily contemplates that a suspect will be under arrest, frequently in a jailhouse or station house setting." *Reynolds v. State,* 88 Md.App. 197, 209, 594 A.2d 609 (1991), *aff'd,* 327 Md. 494, 610 A.2d 782 (1992), *cert. denied,* 506 U.S. 1054, 113

S.Ct. 981, 122 L.Ed.2d 134 (1993). But, the concept of "custody" is not necessarily limited to a formal arrest; "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam). As the Supreme Court explained in *Thompson*, 516 U.S. at 112, 116 S.Ct. 457, custody may be found when "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave."

"The *Miranda* custody inquiry is an objective test." *Alvarado*, 124 S.Ct. at 2151. Therefore, "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam). This means that "custody must be determined based on how a reasonable person, in the suspect's situation would perceive his circumstances." *Alvarado*, 124 S.Ct. at 2148; *see Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). Accordingly, the trial court must assess "all of the circumstances surrounding the interrogation," *Stansbury*, 511 U.S. at 322, 114 S.Ct. 1526, and consider "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.' " *Id.* at 325, 114 S.Ct. 1526.

In *Whitfield v. State*, 287 Md. 124, 411 A.2d 415 (1980), the Court adopted the "objective reasonable person approach to determining custody." *Id.* at 139, 411 A.2d 415. Indeed, the Court expressly said that the "subjective intent" of a law enforcement officer is not relevant in resolving the custody issue. *Id.* at 140, 411 A.2d 415. It determined that " 'custody occurs if a suspect is led to believe, as a reasonable person, that he is being deprived or restricted of his freedom of action or movement under pressures of official authority.' " *Id.* (Citation omitted).

■ To be sure, "[d]eciding when a person has been significantly deprived of his freedom of action so as to be in custody within the meaning of *Miranda* depends on the factual setting surrounding the interrogation in each case." *Id.* at 139, 411 A.2d 415. In this regard, the trial court must consider, *inter alia,* whether the suspect was "physically deprived of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation." *Id.* at 140, 411 A.2d 415 (internal quotation omitted).

The *Whitfield* Court enumerated several factors relevant to the custody determination. It said:

"[T]hose facts intrinsic to the interrogation: when and where it occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning—whether he came completely on his own, in response to a police request, or escorted by police officers. Finally, what happened after the interrogation—whether the defendant left freely, was detained or arrested—may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning."

*Id.* at 141, 411 A.2d 415 (quoting *Hunter v. State,* 590 P.2d 888, 895 (Alaska 1979)).

With this framework, we turn to consider the various statements made by appellant.

## A. Statements at the store parking lot

■ Appellant challenges the admission of the statements he made to the various officers while at the store parking lot. We discern no merit to this contention.

*State v. Rucker, supra,* 374 Md. 199, 821 A.2d 439, is instructive. There, the police received an anonymous tip that Mr. Rucker was dealing drugs. *Id.* at 203, 821 A.2d 439. In response, they went to a shopping center and parked their marked cruiser behind Mr. Rucker's vehicle. *Id.* at 204, 821 A.2d 439. After asking Rucker for his license and vehicle registration, the uniformed officers asked him if he had "anything he was not supposed to have." *Id.* Mr. Rucker admitted that he had cocaine. *Id.* Rucker moved to suppress his statements and the contraband, complaining that the police should have advised him of his *Miranda* rights, because they initiated what amounted to a "de facto arrest." *Id.* at 206, 821 A.2d 439. The circuit court suppressed the statements and we affirmed. *Id.* at 205–06, 821 A.2d 439. The Court of Appeals reversed, concluding that Rucker was not in custody at the time of his statements. *Id.* at 207, 821 A.2d 439. In reaching its decision, the Court pointed to the following: the questioning occurred in a public place; the questioning lasted only a short period of time; only three officers were present; the officers did not condition the return of the license and registration upon Rucker's cooperation; and only one non-coercive question was asked before Rucker made the incriminating statements. *Id.* at 220–21, 821 A.2d 439. *See also Conboy v. State,* 155 Md.App. 353, 369–73, 843 A.2d 216 (2004) (rejecting claim that the investigatory vehicle stop evolved into a custodial detention, and noting that only one trooper was present; defendant was on a busy street during the day; he was not physically restrained; and the trooper never told him that he was not free to leave).

Here, Sergeant Johnston and Officer Burroughs went to the store parking lot in response to appellant's call to the sheriff's office, in which he reported that he had stabbed someone. Johnston saw that appellant was covered in blood and, because she had received information about a stabbing, she asked appellant if he was injured. Appellant said "no" and then voluntarily "started talking," even though Johnston had not asked appellant any other questions. In response to appellant's disclosure that he had stabbed someone, Johnston at-

tempted to ascertain the location of the victim, and appellant indicated that he would try to guide her to the site of the incident. Similarly, when Burroughs initially encountered appellant at the parking lot, he asked "what happened," and appellant readily provided details of the stabbing. These brief encounters with appellant were of a limited nature and were made in a public place, during the day, without the use of any weapons or physical restraints.

Various federal courts have discussed the relationship between *Miranda* and brief investigatory detentions. These cases support our conclusion that appellant was not in custody while at the store parking lot. *See, e.g., United States v. Jones,* 187 F.3d 210, 218–19 (1st Cir.1999)(holding that a stop made on a public highway was not custodial because of the public locale; only one officer questioned each of the defendants; no physical restraint was used; the stop was brief; and the few questions asked were directly related to the justification for making the stop); *United States v. Wyatt,* 179 F.3d 532, 536–37 (7th Cir.1999)(holding that suspect was not in custody when officers asked him to step out of a bar and onto the street for questioning; he was frisked in a well lighted, public area with no use of physical restraint); *United States v. Guerrero–Hernandez,* 95 F.3d 983, 986 (10th Cir.1996)(holding that interrogation was non-custodial when INS agents questioned defendant "outdoors, in a public place, without displaying firearms"); *United States v. Grady,* 665 F.2d 831, 833–34 (8th Cir.1981)(holding that defendant was not in custody when an officer asked him in a liquor store to accompany officer to the parking lot to see if counterfeit bills belonged to the suspect).

### B. The first interview

 We next consider what transpired during appellant's first interview at the sheriff's office.

As noted, Burroughs handcuffed Allen while he was in the police car. After the victim was located, Allen was taken to Rose Hill Farm, where the handcuffs were removed. Based on Burroughs's testimony, appellant was only restrained for

about fifteen to twenty minutes. At that time, Almassy told Allen that he wanted to talk to him about the incident, but he also advised Allen that he was not under arrest; that he did not have to speak with him; and that he was free to leave. Almassy's testimony was not disputed. Allen agreed to go to the sheriff's office to discuss the incident. Although he was transported in a police vehicle, appellant was not handcuffed during the ride.

Appellant was not advised of his *Miranda* rights, either at Rose Hill Farm, on the way to the sheriff's office, or at the sheriff's office. However, at the sheriff's office, Almassy reiterated that appellant was not under arrest and was free to leave. Again, this testimony was not disputed.

During the first interview, appellant was not threatened, nor was he restrained. Moreover, Almassy did not display his weapon. However, Sergeant Almassy told appellant that he could not wash off the blood on his clothes. At the end of the interview, the police took appellant's clothes, gave him a jumpsuit, and then drove him to his parents' home, at appellant's request. Nevertheless, by that point, the police were in the process of obtaining an arrest warrant for Allen and kept him under surveillance in order to be able to effectuate the arrest.

 Although appellant had been transported by the sheriffs to their office for questioning, neither the transportation nor the location of the interview necessarily compels the conclusion that appellant was in custody during the interview. "*Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.' " *Beheler*, 463 U.S. at 1125, 103 S.Ct. 3517 (citation omitted); *see also Dowthitt v. Texas*, 931 S.W.2d 244, 255 (Tex.Crim.App.1996) ("Stationhouse questioning does not, in and of itself, constitute custody."). Moreover, although appellant was in custody earlier in the day, while handcuffed in the back of the police cruiser, that circumstance alone did not require the court to

find that Allen necessarily remained in custody during the first interview at the sheriff's office.

We also recognize that the *Whitfield* Court suggested that events after a police interview, such as a formal arrest, may be relevant to the question of whether the suspect was actually in custody during a prior interview. In this regard, we are mindful that when the police transported Allen to his home, they already knew that they were going to arrest him as soon as possible. But, our focus concerns appellant's state of mind during the interview. Almassy testified that, when he first encountered Allen, he knew little about the circumstances of Butler's death. In other words, Almassy had not fixed on appellant as the culprit when the interview began. Rather, appellant's statements during the interview led Almassy to believe that appellant murdered Butler. That the sheriffs decided to monitor appellant after they drove him to his parents' house, because of what was learned during the interview, does not establish that a reasonable person would have perceived he was in custody while at the sheriff's office during that interview.

*Minehan v. State,* 147 Md.App. 432, 809 A.2d 66, *cert. denied* 372 Md. 431, 813 A.2d 258 (2002), provides some guidance. In *Minehan,* three plainclothes police officers went to Minehan's place of employment and asked to speak with him about a robbery; he agreed to the interview. *Id.* at 439, 809 A.2d 66. Suspecting that Minehan was involved in a series of robberies, the police did not want to trigger *Miranda.* *Id.* at 438–39, 86 S.Ct. 1602. Minehan was "patted down" but not handcuffed before he got into an unmarked police vehicle. *Id.* at 439, 86 S.Ct. 1602. The police brought Minehan to the station and questioned him. *Id.* He incriminated himself approximately one half hour into the two-hour interview. *Id.*

Before trial, Minehan moved to exclude the statements, claiming that his *Miranda* rights had been violated. *Id.* at 440, 86 S.Ct. 1602. The trial court found that Minehan was not in custody during the questioning, and therefore *Miranda*

was not in issue. *Id.* We agreed, concluding that questioning at a police station does not necessarily constitute custodial interrogation. *Id.* at 441–42, 86 S.Ct. 1602. In reaching our conclusion, we pointed to the following: 1) Minehan agreed to accompany the officers; 2) he was not restrained on the drive to the police station; 3) the conversation in the car was "unremarkable;" 4) the police are allowed to exaggerate or mischaracterize the reasons for questioning; 5) Minehan was allowed to leave after the questioning, even though he was arrested a week later; and 6) Minehan stated on the record, "I came on my own free will." *Id.* at 441–43, 86 S.Ct. 1602.

Pursuant to the "reasonable person" analysis, we conclude that the trial court was entitled to find from the evidence that appellant was not in custody during the first interview. Allen was physically restrained only briefly; his physical freedom was restored when the handcuffs were removed at Rose Hill Farm. Moreover, Allen was advised that he was not under arrest, was free to leave, and did not have to "discuss the incident" with the detectives.

### C. The second interview

Appellant challenges the admission of the oral and written statements made during the second interview, claiming they were tainted by the illegality of the first interview. In support of his contention, appellant cites *Missouri v. Seibert,* —— U.S. ——, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), which was pending in the Supreme Court when Allen submitted his brief, but has since been decided.

In *Seibert,* the Supreme Court ruled that when the police deliberately conduct a custodial interrogation without providing *Miranda* warnings, as a ploy to elicit a confession, and then seek to salvage the statement by providing *Miranda* warnings prior to obtaining a second confession, neither confession is admissible. 124 S.Ct. at 2612–13.

In this case, however, appellant was not in custody during the first interview. Therefore, *Seibert* has no application. And, as appellant was *"Mirandized"* prior to the second

interview, his statements obtained during the second interview were properly admitted.

## II.

As noted, appellant was acquitted of first degree premeditated murder, but was convicted of felony murder based on the underlying aggravated robbery. On appeal, Allen challenges the court's jury instructions for both felony murder and robbery.

In pertinent part, the court orally instructed the jury as follows: [4]

There is a statute meaning an enactment of the legislature which says that if you cause or if a murder is caused by your involvement in the commission of any of a list of felonies then that is first degree murder regardless of what your intention was, regardless of whether you were the individual whose act caused the death, period.

Regardless of what you intended other than in connection with the commission of that felony. Suffice it to say for our purposes in this case robbery is one of the felonies on that list. To convict the defendant of first degree felony murder in this case, the State must prove that the defendant committed robbery, that his project involved the robbery [sic] resulted in the killing of John Butler, it is abbreviated here but the principle applies regardless of how many people are involved, and lastly that the act resulted in death. That is what I was talking about a second ago occurred during the commission of that robbery.

As I said also felony murder does not require the State to prove that the defendant intended the victim's death. On [sic] that it resulted from the robbery project.

Okay. Let's talk about robbery, . . . Robbery is the taking of personal property from another person or from his

---

**4.** The court also gave written instructions to the jury, which essentially mirrored its oral instructions.

presence and his control by force or the threat of force, with intent to steal the property.

*The elements are pretty simple and straightforward. To convict someone of robbery the Government must prove that the defendant in this case took the car and keys from Mr. Butler or from his presence and control and they have to prove that he did so by force or the threat of force and that in doing so he intended to steal the property, that is to deprive John Butler of the property ....* That they intended to deprive him of the property. Acts inconsistent with the other person's rights to own or possess.

**Because there was a death here we throw in the additional language ... even if the intent to steal here was not formed until after the victim had died taking his property thereafter would still be robbery, if it was part and parcel of the same occurrence which involved the death.**

In this State there is a separate sentencing provision for robbery with a deadly or dangerous weapon. In order to convict someone of that obviously the Government has to prove all the elements of robbery per se, as well as the additional element that this robbery was effected with the use of some object which was capable of inflicting death or serious bodily harm. Certainly a knife would qualify.

(Italics and boldface added)

At trial, defense counsel excepted to the paragraph quoted above that appears in bold, challenging whether "that language is the appropriate state of the law in Maryland." On appeal, appellant also complains that the court erred by failing to define the word "deprive," used by the court in its robbery instruction. He points out that the word "deprive" has a special meaning, and is a "crucial element" of robbery, as set forth in Maryland Criminal Pattern Jury Instructions ("MCrPJI") 4:28.

We first consider appellant's complaint that the court erred in its jury instruction as to the timing of the formulation of the intent to rob. Allen argues that the court erroneously "in-

structed the jury that the requisite connection between the use of force and such an intent is satisfied so long as they are 'part and parcel of the same occurrence which involved the death.' "

In Allen's view, the instruction in issue was "an inaccurate statement of the current law of robbery" that infected both the felony murder and robbery convictions. Citing *Metheny v. State*, 359 Md. 576, 755 A.2d 1088 (2000), appellant asserts that the Court of Appeals "left unanswered" in *Metheny* whether a felony murder conviction may be upheld when robbery is the underlying felony and the evidence shows that the intent to steal was formed after the killing or the use of force that later resulted in the victim's death. The State responds that the trial court's instruction as to the formation of intent conformed to Maryland law. Relying on *Metheny*, 359 Md. at 606, 755 A.2d 1088, the State claims that " 'the intent to steal must occur at the time of the taking and not necessarily at the time the force is applied to neutralize the victim prior to the robbery.' "

In our analysis, we must consider separately the accuracy of the instructions for robbery and felony murder. We shall first analyze the accuracy of the instructions with respect to robbery.

For many years, robbery was a common law crime in Maryland; the earlier statute, Maryland Code (1957, 1996 Repl.Vol.), Article 27, § 486, only set forth the sanctions upon conviction. *See Borchardt v. State*, 367 Md. 91, 145 n. 9, 786 A.2d 631 (2001), *cert. denied*, 535 U.S. 1104, 122 S.Ct. 2309, 152 L.Ed.2d 1064 (2002); *Facon v. State*, 144 Md.App. 1, 30, 796 A.2d 101 (2002), *rev'd on other grounds*, 375 Md. 435, 825 A.2d 1096 (2003); *Fetrow v. State*, 156 Md.App. 675, 686, 847 A.2d 1249 (2004). Effective October 1, 2000, the General Assembly enacted a statutory robbery offense, which was initially codified in Article 27, § 486 of the Maryland Code. *See* 2000 Md. Laws, ch. 288. It is that statute which was in effect

**240**

on October 24, 2001.[5]

■ Pursuant to Article 27, § 486(b)(1), the statutory offense of robbery retains its " 'judicially determined meaning, except that a robbery conviction requires proof of intent to deprive another of property.' " *Borchardt*, 367 Md. at 145–46 n. 9, 786 A.2d 631. The common law definition of robbery is well settled. Under Maryland law, "[r]obbery is 'the felonious taking and carrying away of the personal property of another from his person by the use of violence or by putting in fear.' " *Metheny*, 359 Md. at 605, 755 A.2d 1088 (citation omitted); *see Ball v. State*, 347 Md. 156, 184, 699 A.2d 1170 (1997), *cert. denied*, 522 U.S. 1082, 118 S.Ct. 866, 139 L.Ed.2d 763 (1998). Put another way, robbery is a larceny or theft accompanied by violence or putting in fear. *West v. State*, 312 Md. 197, 202, 539 A.2d 231 (1988).

■ Larceny is an element of robbery, and " 'there can be no robbery without a larcenous intent. . . .' " *Hook v. State*, 315 Md. 25, 30, 553 A.2d 233 (1989) (citation omitted). Therefore, the elements of larceny are important to an understanding of robbery. Larceny is defined as " 'the fraudulent taking and carrying away of a thing without claim of right *with the intention of converting it to a use other than that of the owner without his consent.*' " *Metheny*, 359 Md. at 605, 755 A.2d 1088 (quoting *Hook*, 315 Md. at 31, 553 A.2d 233)(emphasis in *Hook*). Robbery is also a specific intent crime. *Coles v. State*, 374 Md. 114, 123, 821 A.2d 389 (2003); *Fetrow*, 156 Md.App. at 687, 847 A.2d 1249. Of significance here, the Court has held that "the intent to steal must occur at the time of the taking and not necessarily at the time the force is applied to neutralize the victim prior to the robbery." *Metheny*, 359 Md. at 606, 755 A.2d 1088.

■ Robbery with a dangerous or deadly weapon is the offense of common law robbery, aggravated by the use of a

---

5. Effective October 1, 2002, Art. 27, § 486 was recodified, without substantive change, as Md.Code (2002), Criminal Law Article, §§ 3-401(e) and 3-402(a).

"dangerous or deadly weapon." *Couplin v. State,* 37 Md.App. 567, 582, 378 A.2d 197 (1977), *cert. denied,* 281 Md. 735 (1977); *see Bowman,* 314 Md. at 730, 552 A.2d 1303; *Facon,* 144 Md.App. at 31, 796 A.2d 101; *Bates v. State,* 127 Md.App. 678, 688, 736 A.2d 407, *cert. denied,* 356 Md. 635, 741 A.2d 1095 (1999); *Bellamy v. State,* 119 Md.App. 296, 306, 705 A.2d 10, *cert. denied,* 349 Md. 494, 709 A.2d 139 (1998). *See also* Md.Code (2002), Criminal Law Article § 3–403.

We are satisfied that, for purposes of the robbery offense, the court did not err in its instructions to the jury. This is because a robbery conviction may be based on evidence that shows the intent to steal was formed after the application of force. We explain.

*Stebbing v. State,* 299 Md. 331, 473 A.2d 903, *cert. denied,* 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984), elucidates the issue generated by appellant. There, the Court of Appeals recognized that "robbery [does not] require that the defendant's violence-or-intimidation acts be done for the very purpose of the taking of the victim's property." *Id.* at 353–54, 473 A.2d 903. Rather, it is "enough that [the defendant] takes advantage of a situation which he created for some other purpose." *Id.* at 354, 473 A.2d 903. Moreover, the Court determined that, so long as "the force precedes the taking, the intent to steal need not coincide with the force." *Id.* at 356, 473 A.2d 903. In that context, the Court concluded that "[i]t is sufficient if there be force followed by a taking with intent to steal as part of the same general occurrence or episode." *Id.* Significantly, the Court added: "Even if the force results in death, a taking and asportation after death is nevertheless robbery." *Id.*

In *Metheny,* 359 Md. 576, 755 A.2d 1088, the Court construed *Stebbing* and characterized it as "an exception to the general requirement that the intent to commit a crime accompany a forbidden act." *Id.* at 606, 755 A.2d 1088. The Court explained that the exception is "justified" because "a felon who applies force to neutralize a victim should be held responsible for that action if the felon later decides to take advantage of

the situation by robbing the victim." *Id.* The Court reasoned: "[W]e have allowed, in such circumstances, for a constructive concurrence of the force and intent to steal at the time of the taking." *Id.*

*Metheny* also provides guidance with regard to the matter of the timing with respect to the use of force and the formation of larcenous intent. Metheny was charged with first degree premeditated murder and robbery, for which the State sought the death penalty. 359 Md. at 583, 755 A.2d 1088. Metheny pleaded guilty to the charges but elected a jury trial as to sentencing. *Id.* The jury sentenced appellant to death "based on its apparently unanimous finding of the aggravating circumstance" that the murder was committed in the course of a robbery. *Id.*

On appeal, Metheny complained, *inter alia,* that the State failed to prove that he committed a robbery of the victim. *Id.* at 584, 755 A.2d 1088. Although Metheny had admitted to the killing, *id.* at 585, 755 A.2d 1088, and also admitted to taking the victim's purse and clothing, *id.* at 586, 755 A.2d 1088, he claimed he had no intent to steal the victim's property, and did not convert the items to his own use. Rather, he claimed to have buried the items. *Id.*

After considering the relationship between the use of force and the formation of larcenous intent, the Court concluded that the trial court did not err in finding an adequate factual basis to support the robbery conviction. *Id.* at 609, 755 A.2d 1088. In the Court's view, an intent to permanently deprive the victim of the property was sufficient, even if Metheny had no intention of converting the victim's property to his own use; the Court regarded as "irrelevant" appellant's claim that he did not "use the clothing or purse for his own use...." *Id.* Moreover, of import here, the Court said: "[T]he trial judge easily could have made a reasonable determination that Appellant was guilty of robbery[,] with the intent to rob [the victim] *arising subsequent to the murder.*" *Id.* (Emphasis added).

We must next address whether the trial judge erred in its jury instructions as to felony murder. We conclude that it did.

Maryland Code (2002), § 2–201(a)(4)(ix) of the Criminal Law Article defines first degree felony murder as a killing committed in the perpetration or attempted perpetration of a robbery under Criminal Law Article § 3–402 (Robbery) or § 3–403 (Robbery with dangerous weapon). As noted, the court below instructed the jury that Allen could be found guilty of felony murder even if he did not form the intent to steal until after the application of force that resulted in the victim's death, so long as the taking of personal property was "part and parcel" of the same episode. In formulating its felony murder instruction, the trial court relied on *Higginbotham v. State,* 104 Md.App. 145, 655 A.2d 1282 (1995). There, we said:

> Under *Stebbing,* if a person commits an act of force that causes the death of the victim and then forms the intent to deprive the victim permanently of his property, the taking of the property with that intent may constitute robbery if the act causing the death and the "taking with intent to steal [are] part of the same general occurrence or episode."

*Id.* at 158–59, 655 A.2d 1282 (citation omitted). As we shall see, the viability of *Higginbotham* was questioned in *Metheny,* 359 Md. at 630 n. 23, 755 A.2d 1088.

In *Metheny,* 359 Md. at 609, 755 A.2d 1088, the Court considered whether the evidence supported the finding of a statutory aggravating circumstance of robbery, sufficient to support capital murder under Md.Code (1957, 1996 Repl.Vol., 1999 Supp.), § 413(d)(10) of Article 27.[6] Although the Court was satisfied that the appellant robbed the victim, it concluded that he did not commit the murder " 'while committing or attempting to commit' " a robbery within the meaning of Art. 27, § 413(d)(10). *Id.* at 615, 755 A.2d 1088 (quoting § 413(d)(10)). Rather, it determined that "the predicate felo-

---

**6.** This provision is now codified in *Criminal Law Article* § 2–303(g)(x).

ny aggravator, robbery, was an afterthought to the murder of the victim," *id.* at 618, 755 A.2d 1088, because the murder occurred "before the intent arose to deprive permanently the victim of her clothing and purse." *Id.*

As a matter of statutory construction, the Court reasoned that the Legislature's use of the phrase, " 'while committing or attempting to commit,' " demonstrated "a legislative intent that a murder, in order to qualify for punishment by death, must have been connected to the aggravating crime by more than mere coincidence, therefore eliminating from death penalty consideration a robbery committed as an afterthought." *Id.* at 618, 755 A.2d 1088. Of note here, in the context of robbery and premeditated murder, the Court said:

> **Thus, a murderer may be convicted, as we have reconfirmed in this case, of an "afterthought" robbery against his or her murder victim, where indisputably the necessary intent is formed *subsequently* to the murder and the requisite element of force is imported from that employed to commit the murder itself,** the lawful convictions of murder *and* robbery under such a scenario do not fit within the death penalty scheme under § 413(d) on account of the inherent lack of concurrence between the intents to commit the respective crimes. In order to be death eligible in the present case, the evidence would have had to support the conclusion that Appellant killed [the victim] **at the same time he was robbing her or in furtherance of an already-formed intent to rob her.** Because the evidence in this case is uncontroverted that Appellant did not form the intent to rob the decedent until after he had killed her, as an afterthought, the requisite connection between the two crimes is not satisfied and he may not in turn be put to death for her murder.[ ]

Id. at 618–19, 755 A.2d 1088 (italics in original; boldface added).

As appellant points out, the *Metheny* Court was "not presented with, and thus [did] not decide, the question of whether an 'afterthought' to commit a felony, specifically the intent to

rob ... formed after a murder, is encompassed by the felony-murder rule and thus may underlie a felony murder conviction ..." But, the Court pointed to "decisions on this very issue by some other jurisdictions [to] support [its] conclusion that an afterthought robbery may not serve as a death penalty aggravator, whether alone or in conjunction with any other aggravator(s)." *Id.* at 623–24, 755 A.2d 1088. The Court said:

It appears that the majority view in this country is the more narrow view of felony-murder and thus, there can be no felony-murder where the felony occurs as an afterthought following the killing.... This majority view holds that in order to establish felony-murder, the intent to commit the felony must exist prior to or concurrent with the commission of the act causing the death.

* * *

While it is unnecessary in this case to decide to which of these views Maryland subscribes, because Metheny was not convicted of felony-murder, we consider the subject here solely for the weight it contributes by analogy to the issue before us. That the majority of our sister States has determined that at least concurrence of criminal intents, as well as the commission of the underlying felony and the murder, is required to convict a defendant of first degree felony murder further buttresses our conclusion that the ultimate penalty of death ought to be imposed only where such concurrence is proven to exist.

*Id.* at 629–30, 755 A.2d 1088 (internal citations omitted).

The Court concluded that there was "no evidence that Appellant murdered [the victim] while robbing her of her clothing and purse." *Id.* at 631, 755 A.2d 1088. Indeed, the Court observed that "while the murder may have been a factor in creating a situation ripe for robbery, the robbery was not a factor in bringing about the death of Appellant's victim.... [Appellant's] conception of the design to rob [the victim] of her clothing and purse was not formed until after the murder." *Id.* Therefore, the Court said: "Because the intent to steal was formed after the murder, a rational trier of

fact could not have found that Appellant murdered [the victim] while committing the robbery." *Id.*

The Court then explained why its holding was not inconsistent with its decision in *Stebbing.* It noted that "the robbery in *Stebbing* was not necessarily the basis for the felony murder conviction." *Id.* at 632, 755 A.2d 1088. Moreover, in a footnote, the *Metheny* Court discussed *Higginbotham*, 104 Md.App. 145, 655 A.2d 1282, observing that it "went too far in stretching the scope of the felony-murder doctrine beyond its traditional foundation in Maryland and that it perhaps misconstrues *Stebbing.*" *Metheny*, 359 Md. at 630 n. 23, 755 A.2d 1088.

Based on our review of *Metheny*, we conclude that if an "afterthought" robbery cannot constitute an "aggravating circumstance" for imposition of the death penalty in regard to first degree premeditated murder, it cannot support a conviction for felony murder. Put another way, appellant could not be found to have committed felony murder on the basis of a determination that he formed the intent to rob the victim only *after* he inflicted the fatal injuries. It follows that the court erred by instructing the jury that appellant could be found guilty of felony murder "even if the intent to steal here was not formed until after the victim had died," because "taking his property thereafter would still be robbery, if it was part and parcel of the same occurrence which involved the death."

We acknowledge that, based on the evidence, some or all of the jurors might well have believed that appellant did not commit an "afterthought" robbery. Rather, they may have found that Allen formulated the intent to rob *before* he killed the victim. On the basis of the erroneous jury instructions, however, it is also possible that some or all of the jurors may have believed that appellant formed the intent to rob as an afterthought.

Because we have no way of knowing whether the jury unanimously agreed that appellant formed the intent to rob prior to or while in the commission of the murder, we cannot sustain the felony murder conviction. *See Snowden v. State,*

321 Md. 612, 619, 583 A.2d 1056 (1991)(stating that when the judge's rationale for separate convictions for battery and robbery is not apparent, the defendant must be given the benefit of the doubt and the sentences must be merged); *Nightingale v. State,* 312 Md. 699, 708, 542 A.2d 373 (1988)("The problem, then, is that we cannot tell whether these general verdicts of guilty were based on the use of sexual offenses as lesser included offenses (or elements) of child abuse, or whether the child abuse verdicts were based on other reasons (*e.g.,* some sort of sexual molestation which the juries thought did not rise to the level of a sexual offense in any degree). In these circumstances we resolve the ambiguity in favor of the defendants and set aside the judgments on the sexual offense counts."); *Cortez v. State,* 104 Md.App. 358, 361, 656 A.2d 360 (1995)(stating that when it is unclear from the record whether the jury found "separate insults" to the victim to support separate sentences for battery and fourth degree sexual offense, the court must view the verdict in the light most favorable to the defendant and merge the offenses.).

Our disposition as to the claim of error in regard to the jury instruction for felony murder makes it unnecessary for us to consider appellant's claim of error as to the court's failure to define the term "deprive" in connection with its robbery instruction. We note only that appellant's trial counsel never asked the court to define the term "deprive" in the context of a robbery instruction, but that omission is not likely to recur on remand.

## III.

Of necessity, we must address appellant's contention that the evidence was insufficient to sustain the robbery and felony murder convictions. If the evidence was insufficient, as appellant contends, "principles of double jeopardy [would] preclude retrial...." *Graham v. State,* 151 Md.App. 466, 485, 827 A.2d 874 (2003). Because we hold that the evidence was sufficient to establish felony murder based on the underlying

felony of robbery, we shall remand for a new trial. We explain.

Allen asserts:

[T]here is absolutely no evidence on the record from which a rational trier of fact could have found that the appellant ever possessed the intent to deprive Butler of his property. This is not a case where the intent was formed after the force [was] applied, this is a case where the intent was simply never formed.

Further, appellant claims that "the undisputed evidence" showed only that Allen "jingled" the victim's keys to induce the victim to take him home, but that he "had absolutely no intent 'to steal' the car, before or after the killing of Butler." Rather, Allen contends that he "only took the car in a panic after remembering that there was no working phone. He then drove the car to get help." Appellant also maintains that the evidence was insufficient to support his conviction for felony murder, because the taking of the victim's car was merely an "afterthought" and an "afterthought felony" is not sufficient to sustain a felony murder conviction.

As discussed, *supra*, we agree with appellant that an "afterthought" robbery cannot serve as the basis for a felony murder where robbery is the predicate felony. But, we agree with the State that appellant has ignored the other evidence presented to the jury that supports the conclusion that the formation of the requisite intent was not an afterthought.

When reviewing a claim based on sufficiency of evidence, we must determine "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see Moye v. State*, 369 Md. 2, 12, 796 A.2d 821 (2002); *Winder v. State*, 362 Md. 275, 325, 765 A.2d 97 (2001). Evidence is sufficient if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 319, 99 S.Ct. 2781 (emphasis in original); *see*

*Dawson v. State,* 329 Md. 275, 281, 619 A.2d 111 (1993). We review the evidence in the light most favorable to the prevailing party, and will reverse the judgment only if we conclude that "no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781; *see Facon v. State,* 375 Md. 435, 454, 825 A.2d 1096 (2003); *Coles v. State,* 374 Md. 114, 122, 821 A.2d 389 (2003); *State v. Sowell,* 353 Md. 713, 726, 728 A.2d 712 (1999).

 In regard to sufficiency, the limited question before an appellate court "is not whether the evidence *should have or probably would have* persuaded the majority of fact finders but only whether it *possibly could have* persuaded *any* rational fact finder." *Fraidin v. State,* 85 Md.App. 231, 241, 583 A.2d 1065, *cert. denied,* 322 Md. 614, 589 A.2d 57 (1991)(emphasis in original). Moreover, it is not the function of the appellate court to determine the credibility of witnesses or the weight of the evidence. *Jones v. State,* 343 Md. 448, 465, 682 A.2d 248 (1996); *McCoy v. State,* 118 Md.App. 535, 537, 703 A.2d 237 (1997), *cert. denied,* 349 Md. 235, 707 A.2d 1329 (1998). And, circumstantial evidence is qualitatively as sufficient as direct evidence to support a conviction. *Jensen v. State,* 127 Md.App. 103, 117, 732 A.2d 319, *cert. denied,* 356 Md. 178, 738 A.2d 855 (1999).

Applying the applicable standard of review to the evidence adduced at trial, we conclude that the evidence was more than sufficient to support appellant's conviction for first degree felony murder with robbery as the predicate felony. In other words, even though the larcenous intent must precede or coincide with the use of force in order for robbery to serve as the predicate felony for felony murder, we are satisfied that a rational jury could readily conclude that such intent was formed before the murder. Again, we explain.

Appellant made a 911 call and reported that he stabbed the victim, took the victim's car, and "ran," driving the car into a ditch. Appellant denied that the victim assaulted him, but

claimed the victim would take him home in the morning so he "grabbed the keys" and then the victim "came at [him]...."

Sergeant Johnston testified that, at the store parking lot, appellant told her he wanted to leave the victim's abode, but "the person wouldn't take him home," so he took the car keys. Then, the victim came running after appellant; Allen stabbed him and then fled in the car. Similarly, Officer Burroughs testified that, at the parking lot, he asked Allen "what happened." Allen told him that he asked the victim to take him home, but the victim did not comply, so Allen "tried to take the car keys that belonged to the victim.... Appellant stabbed the victim and fled the scene in the victim's vehicle."

According to Almassy, Allen told him that, on the morning of the incident, he told Butler that he wanted to leave, and Butler told him "to chill out and go in the kitchen and get a beer or something." Allen said he "was just trying to figure out a way that he could get the victim to ... get him out of there." Allen told the victim "that he would drive himself out of there and he picked up the victim's keys and jingled the keys." Specifically, he told the victim: "[A]ll right I will drive out of this mother fucker myself." In response, the victim said to Allen: "[W]ait a minute damn it," and approached the kitchen doorway. When the victim approached, Allen dropped the keys and grabbed a knife in the kitchen. During the ensuing struggle, Allen stabbed the victim. Thereafter, Allen "ran in and picked up the car keys and ran out of the door of the residence." Allen told Almassy that he took the victim's car because he was "just trying to get back to Bladensburg."

As noted, appellant was the only defense witness. He testified that he shook the keys and told the victim, "if you won't get up to take me I will just drive out of here myself." Allen's testimony about how he came to take the keys and the car was consistent with his oral and written statements, as related by the other witnesses.

In the light most favorable to the State, the jury had ample grounds to find that appellant formulated the intent to take the victim's car before or at the time he stabbed Mr.

Butler. To be sure, appellant claimed that he only "jingled" the keys to induce the victim to drive him home; he had no intention of taking the car; and merely took the vehicle as a means of escape, while in a panic. But, the jury did not have to credit that testimony. It was the jury's task to resolve any conflicts in the evidence and assess the credibility of witnesses. *State v. Albrecht*, 336 Md. 475, 478, 649 A.2d 336 (1994); *Hall v. State*, 119 Md.App. 377, 393, 705 A.2d 50 (1998). The factfinder can accept all, some, or none of the testimony of a particular witness. *Snyder v. State*, 104 Md. App. 533, 549, 657 A.2d 342, *cert. denied*, 340 Md. 216, 665 A.2d 1058 (1995).

## IV.

Appellant asserts that the trial court erred in not merging his convictions for felony murder and second degree murder. He asserts that because only one person was killed, only one sentence is proper; one cannot be convicted of killing the same person twice. Similarly, appellant argues that his robbery conviction should have merged with the felony murder conviction, because it was the underlying felony.

The State concedes error. However, because we must vacate the felony murder conviction and remand for a new trial as to that charge, we need not further address this issue.

**FIRST DEGREE FELONY MURDER CONVICTION VACATED; ALL OTHER JUDGMENTS AFFIRMED; CASE REMANDED TO THE CIRCUIT COURT FOR CHARLES COUNTY FOR FURTHER PROCEEDINGS; COSTS TO BE PAID 50% BY APPELLANT, 50% BY CHARLES COUNTY.**